IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**STATE OF ARIZONA**,
*Appellee*,

*v.*

**PRESTON ALTON STRONG**,
*Appellant*.

---

No. CR-17-0201-AP
Filed September 3, 2024

---

Appeal from the Superior Court in Yuma County
The Honorable Maria Elena Cruz, Presiding Judge
No. S1400CR201400685
**AFFIRMED**

---

COUNSEL:

Kristin K. Mayes, Arizona Attorney General, Joshua Bendor, Solicitor General, Jason Lewis, Chief Counsel, Capital Litigation Section, Laura P. Chiasson (argued), Assistant Attorney General, Tucson, Attorneys for State of Arizona

Harriette P. Levitt (argued), Law Offices of Harriette P. Levitt, Tucson; Julie Hall, Office of the Conflict Administrator, Yuma County Public Defender's Office, Yuma, Attorneys for Preston Alton Strong

―――――――

JUSTICE BEENE authored the Opinion of the Court, in which CHIEF JUSTICE TIMMER, VICE CHIEF JUSTICE LOPEZ and JUSTICES BRUTINEL, BOLICK, MONTGOMERY, and PELANDER (RETIRED) joined.[*]

―――――――

JUSTICE BEENE, Opinion of the Court:

¶1          Preston Strong was sentenced to death after a jury found him guilty of six counts of first degree murder.  We have jurisdiction of this automatic appeal pursuant to article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and -4033(A).  We affirm Strong's convictions and sentences.

## BACKGROUND[1]

¶2          Strong and victim Luis Rios were close friends.  Strong had a history of financial troubles, and Luis loaned Strong money on a regular basis.  Approximately one month before the murders, Luis's cousin, Hermes Soto Rios ("Soto"), heard what sounded like an argument between Luis and Strong.  After the apparent argument, Luis told Soto that Strong "was kind of upset" because Luis had refused to loan Strong more money.

¶3          At the time of the murders, Luis and victim Adrienne Heredia lived together at East La Mesa Street in Yuma (the "East La Mesa residence") with Adrienne's four children, victims: A.C. (age thirteen), E.B. (age twelve), I.N. (age nine), and D.H. (age six).  Adrienne was separated from D.H.'s father, Danny Heredia, but Danny typically took care of D.H. and I.N. every Thursday and Friday.

¶4          On Friday, June 24, 2005, Danny had arranged to call Adrienne before dropping off D.H. and I.N. with her at 6:00 p.m.  After several unsuccessful attempts to reach Adrienne by phone, Danny became worried and decided to go to the East La Mesa residence.

―――――――

[*] Pursuant to article 6, section 3 of the Arizona Constitution, Justice John Pelander (Ret.) of the Arizona Supreme Court was designated to sit in this matter.

[1] We view the facts in the light most favorable to sustaining the jury's verdicts.  *See State v. Gallegos*, 178 Ariz. 1, 9 (1994).

¶5        Danny arrived at approximately 5:30 p.m. Adrienne's PT Cruiser was in the driveway, but she did not answer the door. After knocking several times and receiving no answer, Danny waited with D.H. and I.N. before getting in his truck to drive away. As he drove, he saw Luis driving down the street in his Dodge Durango. Danny turned around and followed Luis back to the East La Mesa residence.

¶6        Danny told Luis he had been unable to contact Adrienne, and Luis commented that he had also been unable to reach her. Danny left the children with Luis, who took them inside the house. When Adrienne did not come outside, Danny tried calling her again to let her know he had left the children with Luis. Adrienne did not answer her phone, and Danny left a message.

¶7        Danny drove back to his apartment. As he pulled into the parking lot, he received a call from Adrienne's telephone. When Danny answered, however, Luis was on the other end. Luis had never called him before. Luis told Danny that "Adrienne was tripping," which confused Danny. Danny thought Luis and Adrienne had been arguing, and he told Luis to tell Adrienne to let him know if she needed help with the children.

¶8        Later that evening, Danny returned to the East La Mesa residence to drop off some clothing for the children. Although Adrienne and Luis's vehicles were in the driveway, no one answered when Danny knocked on the door. Danny left the clothes in a bag by the door, called Adrienne, and left a voicemail message. While Danny was still at the house, Luis called him again. Luis said that "everything was ok," but Danny saw "[n]o movement, no sound . . . nothing" at the house. Danny left the house and drove to a nearby Circle K store, where a security camera captured his image at 7:53 p.m.

¶9        At approximately 8:15 p.m., a Schwann's delivery man approached the East La Mesa residence. He knocked on the door several times and heard "rustling" inside the house, but no one answered. As he was leaving the neighborhood, he heard a "bang" that sounded like a gunshot. He called the police to report the incident.

¶10        Adrienne and Luis's neighbors, Gabriel Resendez and Rocio Lopez, were in their backyard when they heard gunshots and someone yelling for help from the victims' backyard. While Lopez called 911, Resendez jumped over the wall separating their backyards. Once in the backyard, Resendez saw a man with a gun in his hand. The man "looked at [Resendez] and he looked at his gun, then he just casually walked back

3

into the house." Resendez later identified this man as Strong. Resendez also noticed a trail of blood on the ground and Luis lying on his back with his hands behind him. Luis had been shot in the chest and head.

¶11 When first responders arrived at the East La Mesa residence, they immediately took Luis to the hospital, but he died en route. Police then entered the East La Mesa residence and found the bodies of I.N., A.C., E.B., D.H., and Adrienne (collectively, the "La Mesa Murders"). Autopsies showed that Luis and D.H. died from gunshot wounds while Adrienne, I.N., A.C., and E.B. died of asphyxiation.

¶12 While in the home, police found white plastic bags in a few of the rooms where the victims were found. Analysis later revealed Strong's fingerprints on two of the bags. Police also found Luis's Dodge Durango parked near Sanguinetti Park, and an analysis of Luis's vehicle showed Strong's DNA was on the steering wheel.

¶13 Although law enforcement considered Strong a suspect in the La Mesa Murders, the State did not indict him until 2014, nine years after the killings. In the interval between the La Mesa Murders and Strong's indictment, he was convicted in 2012 for the murder of Dr. Satinder Gill (the "Gill Murder"). Strong was sentenced to natural life in prison for the Gill Murder, a conviction affirmed on appeal. *State v. Strong*, No. 1 CA-CR 12-0754, 2014 WL 4318326, at *8 ¶ 37 (Ariz. App. Sept. 2, 2014) (mem. decision).

¶14 In June 2014, the State charged Strong with six counts of first degree murder. The State alleged four aggravating circumstances pursuant to A.R.S. § 13-751(F) (2012): (1) Strong had been convicted of another offense for which a life sentence could be imposed, (F)(1); (2) Strong had been convicted of committing one or more other homicides during the commission of the offense, (F)(8); (3) with respect to the child victims, that Strong was an adult and the murdered person was under fifteen years of age, (F)(9); and (4) Strong had committed the murders in a "cold, calculated manner without pretense of moral or legal justification," (F)(13). *See* § 13-751(F)(1), (F)(8), (F)(9), (F)(13) (2012).[2]

---

[2] After this case was tried, the legislature amended § 13-751 and eliminated multiple aggravators, including the cold-and-calculated aggravator in subsection (F)(13). It also renumbered the remaining paragraphs within subsection (F). *See* 2019 Ariz. Sess. Laws ch. 63, ¶ 1 (1st Reg. Sess.). Here, we cite the version of § 13-751 in effect at the time of sentencing.

¶15            In August 2015, Strong moved to change the venue on the grounds of prejudicial pretrial publicity, but the trial court denied the motion.  In April 2016, Strong moved to suppress Soto's testimony about the argument and the debt between Luis and Strong.  Lastly, in September 2016, Strong moved to dismiss the case due to preindictment delay.  The court denied Strong's motion to dismiss and, after holding an evidentiary hearing, also denied his motion to suppress.

¶16            In April 2017, the jury found Strong guilty of six counts of first degree murder.  During the trial's aggravation phase, the jury found that the State had proved the alleged aggravating circumstances.  During the penalty phase, the trial court determined it should not have instructed the jury on § 13-751(F)(13)'s "cold-and-calculating" aggravating factor.  The court accordingly instructed the jury to not consider that aggravating factor in sentencing Strong.  After considering the mitigation evidence, the jury determined that Strong should be sentenced to death for the six murders.  The court then imposed the death sentence for each of the murder convictions.

¶17            After the conclusion of the case, defense counsel spoke with Juror 47 about her knowledge of Strong's conviction for the Gill Murder.  Following this conversation, Strong moved for a new trial, alleging several grounds, including juror misconduct.  In support of his juror-misconduct claim, Strong asserted that, before being impaneled, Juror 47 failed to disclose that she knew Strong had been previously convicted of the Gill Murder.  Strong also moved to vacate the judgment, but the trial court denied both motions after a hearing.

¶18            Strong appealed the judgments and his sentences.  *See* A.R.S. § 13-4031; Ariz. R. Crim. P. 26.15, 31.2(b).  After oral argument before this Court, we issued a Decision Order staying the appeal and remanding with instructions to the trial court to hold an evidentiary hearing to determine "the circumstances of Juror 47's alleged misconduct and knowledge of the Gill Murder and prior conviction, and whether or not it was harmless." *State v. Strong*, No. CR-17-0201-AP, at 5 (Ariz. May 26, 2020) (dec. order).

¶19            After conducting the hearing, the trial court found that "Juror 47 knew of the Gill case at the time of the murder and subsequent conviction, [but] she had forgotten that Strong was the person convicted of Gill's murder."  Therefore, the court could not "find that there was any prejudicial information known to Juror 47 during the trial" or that "there was any juror misconduct by Juror 47 or any other juror in this case."  Following the hearing and the trial court's ruling, jurisdiction revested in

this Court.  The parties submitted supplemental briefing on the issue of alleged juror misconduct.

## DISCUSSION

¶20        Strong presents nine issues on appeal.  For the reasons stated below, we affirm his convictions and sentences.

### A.  Preindictment Delay

¶21        Strong argues that the nine-year delay between the La Mesa Murders and his 2014 indictment for these crimes was unreasonable because it provided the State with a tactical advantage and prejudiced him due to the unavailability of certain witnesses.  Strong also asserts that he has the "right to a speedy indictment" pursuant to the Fifth and Fourteenth Amendments and article 2, sections 23 and 24 of the Arizona Constitution.

¶22        We review the trial court's denial of a motion to dismiss for preindictment delay for abuse of discretion.  *State v. Hansen*, 156 Ariz. 291, 294 (1988).

¶23        The due process guarantee of the Fifth and Fourteenth Amendments safeguards criminal defendants from unreasonable preindictment delay.  *State v. Lacy*, 187 Ariz. 340, 346 (1996).  For a delay in prosecution to be unreasonable, a defendant must show that (1) "the prosecution intentionally slowed proceedings to gain a tactical advantage or to harass the defendant," and (2) "actual prejudice resulted."  *Id.* Investigative delay does not impermissibly slow proceedings, *see State v. Broughton*, 156 Ariz. 394, 398 (1988), and not filing charges immediately upon securing enough evidence to prove guilt beyond a reasonable doubt is not intentional harassment, *see United States v. Lovasco,* 431 U.S. 783, 792, 794–96 (1977); *Lacy*, 187 Ariz. at 346.  Proof of "actual prejudice" must be "definite and not speculative."  *United States v. Valentine*, 783 F.2d 1413, 1416 (9th Cir. 1986) (quoting *United States v. Moran*, 759 F.2d 777, 782 (9th Cir. 1985)).

¶24        Strong moved to dismiss the charges based on preindictment delay in September 2016.  The trial court denied the motion, finding Strong failed to establish that the State intentionally slowed the proceedings in the hope of obtaining a tactical advantage or to harass him.  The court further found that—even if Strong had shown culpable prosecutorial misconduct on the issue of preindictment delay—he failed to show prejudice.

¶25        Here, we find no abuse of discretion in the trial court's findings because, as a threshold matter, the record contains no evidence that the State "intentionally slowed proceedings to gain a tactical advantage or to harass the defendant." *See Lacy*, 187 Ariz. at 346. Moreover, Strong's arguments on the issue of prejudice are unavailing.

¶26        First, Strong argues that certain witnesses died before he was indicted. He claims their testimony would have shown that more than one gunman entered the victims' residence on the night of the murders, rebutting the State's witnesses. But as the trial court determined, Strong's claim is too speculative to grant relief. *See Valentine*, 783 F.2d at 1416.

¶27        Next, Strong claims that he was unable to introduce the testimony of Edward Miknaitis, an eighty-four-year-old retired Yuma Police Department ("YPD") identification technician, who suffered several strokes during the period between the murders and trial, which rendered him incompetent to testify. Strong claims Miknaitis would have testified that "his notes and reports were taken and lost by the [YPD]" and that "after he put down evidence markers at the crime scene, an FBI technician moved his markers," thereby supporting Strong's claim that evidence at the crime scene had been tampered with. But at Miknaitis's competency hearing, Miknaitis told the court that he only "heard . . . through the grapevine" that evidence markers had been moved, and Strong ultimately did not seek to have him testify on that matter. Furthermore, the testimony at trial did not establish precisely when Miknaitis suffered his strokes or at what point in time his memory was affected. Accordingly, this claim of prejudice is also too speculative.

¶28        Strong also asserts that he was prejudiced by the delay because mitigation witnesses died "since the case began," but he fails to describe or explain how these witnesses would have aided his case. *See State v. Torres*, 116 Ariz. 377, 379 (1977) ("A mere assertion of the unavailability of an eyewitness is insufficient to show that a denial of due process has occurred.").

¶29        Finally, Strong argues the delay caused a key eyewitness, Gabriel Resendez, to change his testimony. Strong, however, failed to establish how the delay *caused* Resendez to alter his description of the murderer. Even so, Strong was able to demonstrate that Resendez changed his initial identification of the killer from a Hispanic male to an African-American male in later identifications. Because Strong was able to confront Resendez and impeach him with countervailing evidence as to

Resendez's initial identification, Strong suffered no prejudice from the delay.

¶30        At bottom, the prejudice that Strong complains of primarily concerns the unavailability and diminished memory of witnesses, which is insufficient to establish a due process violation—and is counterbalanced by the fact that the State also suffered from unavailable witnesses. *See State v. Dunlap*, 187 Ariz. 441, 450–51 (App. 1996); *Broughton*, 156 Ariz. at 398. Absent a demonstration by Strong that the unavailable witnesses "would have testified, the jury would have found the witness credible, and the testimony of the witness would have affected the outcome of the trial," his claims fail. *See Dunlap*, 187 Ariz. at 451.

¶31        Furthermore, Strong conflates the rights guaranteed by the Fifth and Sixth Amendments.  The protection afforded by the Sixth Amendment's speedy-trial guarantee "is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution." *United States v. Marion*, 404 U.S. 307, 313 (1971); *accord State v. Williams*, 183 Ariz. 368, 379 (1995) (explaining that the right to a speedy trial only attaches *after* an indictment has been returned).  Conversely, the Fifth Amendment's due-process guarantee does not define a specific right to a speedy indictment and only safeguards against an *unreasonable* delay under limited circumstances. *See Lovasco*, 431 U.S. at 789–90.  And as we have just explained, those limited circumstances are not present here.  Thus, the court did not abuse its discretion in denying Strong's motion to dismiss based on preindictment delay.

## B.  Change Of Venue

¶32        Strong argues that both the La Mesa and Gill Murders resulted in "considerable pretrial publicity," prejudicing the jury pool in Yuma County and increasing the risk that jurors may remember Strong's conviction for the Gill Murder during trial.  In his motion to change venue, Strong argued that a different trial location would save judicial resources expended on extensive individual voir dire and prevent possible contamination of the jury, repeated jury selection, or a new trial.

¶33        We review the trial court's ruling on a motion for change of venue based on pretrial publicity for abuse of discretion. *State v. Payne*, 233 Ariz. 484, 499 ¶ 26 (2013).  "A defendant is entitled to change the venue for

his trial 'if a fair and impartial trial cannot be had.'" *Id.* ¶ 28 (quoting Ariz. R. Crim. P. 10.3(a)).[3]

**¶34**        In August 2015, sixteen months before jury selection commenced, Strong moved for a change of venue.  In January 2016, the trial court denied Strong's motion and in January 2017, jury selection began. Strong did not supplement or renew his motion with recent news articles or additional evidence of pretrial publicity.

**¶35**        In denying Strong's motion for change of venue, the court found that "there was a fair amount of publicity when defendant was charged in this case in June 2014" but that "[r]ecently . . . the media coverage has been minimal."  The court further noted that "the media attention in this matter has been confined to reporting what has occurred in court proceedings and a brief mention of the Gill case."

**¶36**        The issue of "pretrial publicity" is analyzed in two steps. *State v. Cruz*, 218 Ariz. 149, 156 ¶ 14 (2008).  First, we examine whether the publicity permeated the court proceedings so pervasively that prejudice can be presumed.  *Id.*  Next, if the level of publicity was such that prejudice cannot be presumed, we then ask whether the defendant has shown actual prejudice among the members of the jury.  *Id.*

**¶37**        Prejudice will only be presumed when the publicity "was so extensive or outrageous that it permeated the proceedings or created a carnival-like atmosphere."  *Payne*, 233 Ariz. at 499 ¶ 28 (quoting *State v. Blakley*, 204 Ariz. 429, 434 ¶ 14 (2003)).  "The publicity must be so unfair, prejudicial, and pervasive that jurors could not decide the case fairly, even if they avow otherwise."  *State v. Forde*, 233 Ariz. 543, 554 ¶ 13 (2014).  The burden to show prejudice is on the defendant, *Payne*, 233 Ariz. at 499 ¶ 28, and is "extremely heavy," *Forde*, 233 Ariz. at 554 ¶ 13 (quoting *State v. Bible*, 175 Ariz. 549, 564 (1993)).  Consequently, the standard is rarely met.  *See State v. Davolt*, 207 Ariz. 191, 206 ¶ 46 (2004).

**¶38**        Further, we will not presume prejudice when the publicity did not occur near the time of trial or is mostly factual and not

---

[3]  The language of Rule 10.3(a) quoted in *Payne* in 2013 is the same as the language of Rule 10.3(a) at the time of Strong's motion for a change of venue.  *See* Ariz. R. Crim. P. 10.3(a) (2015) (stating a defendant "shall be entitled to a change of the place of trial to another county, *if a fair and impartial trial cannot be had* for any reason other than the interest or prejudice of the trial judge" (emphasis added)).

inflammatory. *Id.* "The mere fact that jury members have been exposed to the facts of the case through media coverage does not create a presumption of prejudice if the jurors can lay aside that information and render a verdict based on the evidence." *Cruz*, 218 Ariz. at 156–57 ¶ 14.

¶39 Here, the trial court properly ruled that prejudice could not be presumed. The media coverage reflected in the news articles about Strong's trial was not "so extensive" to create a "carnival-like atmosphere." *See Payne*, 233 Ariz. at 499–500 ¶¶ 27–29 (quoting *Blakley*, 204 Ariz. at 434 ¶ 14) (concluding that over 200 newspaper and broadcast reports did not warrant a presumption of prejudice). Instead, the publicity was primarily factual, with articles discussing the ongoing judicial proceedings and "repeat[ing] a basic description of the crime that mirrored indictment allegations." *See id.* at 500 ¶ 29; *see also Davolt*, 207 Ariz. at 206 ¶ 47 (concluding that "twenty newspaper articles and thirteen radio reports" did not warrant a presumption of prejudice when most of them "were generated at the time of the crime and were factual in nature"). Accordingly, the trial court did not abuse its discretion; it properly found that Strong failed to meet the "very heavy burden" of proof necessary to establish a presumption of prejudice. *See Payne*, 233 Ariz. at 500 ¶¶ 29–30 (internal quotation marks omitted) (quoting *Cruz*, 218 Ariz. at 157 ¶ 20); *see also Forde*, 233 Ariz. at 554 ¶ 14 (citing cases); *Davolt*, 207 Ariz. at 206 ¶ 48.

¶40 Just as Strong cannot establish that prejudice should be presumed, neither can he establish that actual prejudice "likely deprived him of a fair trial." *See Davolt*, 207 Ariz. at 206 ¶ 49; *Cruz*, 218 Ariz. at 156 ¶ 14. Actual prejudice occurs when "the jurors have formed preconceived notions concerning the defendant's guilt and that they cannot leave those notions aside." *Davolt*, 207 Ariz. at 206 ¶ 49 (quoting *State v. Chaney*, 141 Ariz. 295, 302 (1984)). "Prior knowledge of the case alone is insufficient to disqualify a juror" because "[t]he critical inquiry is the '*effect* of publicity on a juror's objectivity.'" *Id.* ¶ 50 (quoting *State v. LaGrand*, 153 Ariz. 21, 34 (1987)). "[T]he defendant has the burden of showing *actual* prejudice." *Blakley*, 204 Ariz. at 434 ¶ 16.

¶41 Here, during voir dire, the trial court and defense counsel extensively questioned prospective jurors who indicated that they had received information regarding the facts of either the Gill Murder or the La Mesa Murders through the media, and jurors who indicated they had any knowledge of Strong's 2012 conviction for the Gill Murder were excused for cause. Only jurors who indicated they had no knowledge of Strong's 2012 conviction, could set aside other information learned through the

media, and could decide the case on the evidence presented during trial were allowed to sit on the jury.

**¶42** Further, the fact that a juror who was approached during trial by an individual who informed her that Strong was "already serving a life sentence for murder" and was "totally guilty" does not have any relationship to the impact of pre-trial publicity. That juror was excused from the jury and replaced by an alternate juror.

**¶43** Strong finally argues that because Juror 47 participated in the trial, found him guilty, and voted for death sentences while knowing about his 2012 conviction, there was "evidence that the trial court abused its discretion in denying [Strong's] motion for change of venue." But as will be discussed in Part (D), no competent evidence supports Strong's claim that Juror 47 knew about Strong's conviction for the Gill Murder throughout voir dire or guilt-phase proceedings and deliberations. Strong has therefore failed to show that Juror 47, or any other juror, had "formed preconceived notions concerning [his] guilt and that they [could not lay] those notions aside." *See Davolt*, 207 Ariz. at 206 ¶ 49 (internal quotation mark omitted) (quoting *Chaney*, 141 Ariz. at 302). Accordingly, the court did not abuse its discretion in denying Strong's motion to change venue.

## C. Improper Preclusion Or Limited Admission Of Evidence

**¶44** Strong argues the trial court erred by precluding certain evidence he sought to introduce at trial. Specifically, Strong challenges the court's rulings regarding the following evidence: (1) the testimony of Rocio Lopez and Detective Ben Olivas pertaining to Gabriel Resendez's statements made on the night of the murders; (2) Defense Exhibit 1—Sketch of Suspect; (3) the testimony of Edward Miknaitis; and (4) Defense Exhibit 43—Phone Records.

**¶45** We review the court's evidentiary rulings for an abuse of discretion. *State v. Burns*, 237 Ariz. 1, 17 ¶ 46 (2015). For objected-to trial error, we conduct harmless error review, which "places the burden on the state to prove beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence." *State v. Henderson*, 210 Ariz. 561, 567 ¶ 18 (2005). Conversely, for issues not properly objected to at trial, we review for fundamental error only. *State v. Escalante*, 245 Ariz. 135, 140 ¶ 12 (2018). To prevail under that standard, "a defendant must establish both that fundamental error occurred and that it caused him prejudice (though showing the former may establish the latter)." *State v. Johnson*, 247 Ariz. 166, 185 ¶ 41 (2019). "An error is fundamental if it goes to the foundation

of the case, takes away from the defendant a right essential to his defense, or is of such magnitude that the defendant could not have possibly received a fair trial." *Id.* When determining whether the alleged error caused Strong prejudice, we review "whether, without the error, a reasonable jury could have reached a different result, even if substantial evidence of guilt exists." *See Escalante*, 245 Ariz. at 144 ¶ 34.

### 1. Rocio Lopez and Detective Ben Olivas

**¶46**        Strong argues the trial court erred by precluding statements Resendez made to Lopez on the night of the murders because the statements were admissible excited utterances. *See* Ariz. R. Evid. 803(2).

**¶47**        The State called Resendez as a witness. Resendez testified that, on the night of the murders, he and Lopez were in his backyard when he heard someone yelling for help, followed by gunshots. Resendez further testified that he jumped over the wall into the victims' backyard and saw Strong holding a gun.

**¶48**        Strong sought to introduce testimony from Lopez and YPD Detective Ben Olivas. Both individuals stated that on the night of the incident, Resendez told them that the assailant was a Hispanic man. But the court determined that Resendez's statements to Lopez were inadmissible hearsay. Pursuant to subsections (2) and (5) of Arizona Rule of Evidence 803, however, the court let Strong's counsel read into evidence a relevant portion of Detective Olivas's police report, in which Resendez gave a statement describing the suspect as "a Hispanic male, approximately five foot six inches to five foot eight inches."

**¶49**        "Out of court statements offered to prove the truth of the matter asserted are hearsay and are inadmissible unless they fall within an exception to the hearsay rule." *Payne*, 233 Ariz. at 502 ¶ 49; *see also* Ariz. R. Evid. 801(c)–(d), 802. One of these exceptions is an excited utterance, which is a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Ariz. R. Evid. 803(2). "The exception requires proof of three elements: (1) a startling event, (2) a statement made soon after the event to ensure the declarant has no time to fabricate, and (3) a statement which relates to the startling event." *State v. Bass*, 198 Ariz. 571, 577 ¶ 20 (2000). "The basis for the exception is that the event produces nervous excitement making fabrication unlikely." *State v. Jeffers*, 135 Ariz. 404, 419 (1983).

¶50        "[N]o precise time limits after the event can be established within which a statement will qualify as an excited utterance." *Cruz*, 218 Ariz. at 161 ¶ 55 (quoting Joseph M. Livermore et al., *Arizona Practice: Law of Evidence* § 803.2, at 348 (2000)).  Instead, the court should consider the totality of the circumstances in determining whether a statement is spontaneous. *State v. Anaya*, 165 Ariz. 535, 539 (App. 1990); *see Jeffers*, 135 Ariz. at 420.  "Among the elements usually examined are the time factor between the event and statement, the physical and emotional condition of the declarant, and the nature of the offense." *Anaya*, 165 Ariz. at 539.

¶51        At trial, Lopez testified that she and Resendez were sitting in their backyard when they heard someone yelling for help, followed by gunshots.  She said that while she called 911, Resendez jumped over the wall separating their backyard from the victims' backyard.  Lopez explained that she and Resendez "were all kind of panicked," but she could not say whether Resendez seemed excited at the time of the statement.  She testified Resendez told her that "he saw a guy, a Mexican guy," but she could not remember when Resendez made the statement.

¶52        The State objected to Lopez's testimony on hearsay grounds, and Strong argued that Resendez's statement to Lopez was admissible because it constituted an excited utterance.[4]  The court allowed Strong to attempt to lay foundation for the statement.

¶53        Lopez testified that Resendez appeared "in shock and nervous" when he ran to the fence separating the backyards.  Lopez initially stated Resendez made the statement "before the police got there," but she could not remember how much time had elapsed between Resendez jumping the wall and making the statement or between Resendez's statement and the arrival of the police.  She then said that Resendez made the statement while they were in the alley between the yards "because that's where the police were by that time."

¶54        The State again asserted that Lopez's testimony had not established when Resendez had made the statement.  The trial court sustained the hearsay objection, precluding Lopez's testimony, reasoning that it had not been established *when* Resendez's statements were made.

---

[4]  At trial, Strong also argued that it was an inconsistent statement or a present sense impression.  However, Strong did not raise these arguments in his opening brief, so we do not address them.

¶55            Although Lopez's testimony likely demonstrated Resendez's excitement, the court did not abuse its discretion in precluding Resendez's statements.  *See State v. Carr*, 154 Ariz. 468, 470 (1987) ("We will not reverse a trial court's ruling under the excited utterance exception absent a clear abuse of discretion.").    Lopez's inability to recall *when* Resendez's statements were made meant the temporal requirement of the excited utterance exception was not met.  *See Bass*, 198 Ariz. at 577 ¶ 20 (stating it is the party's burden to demonstrate that the statements were "made soon after the event").

¶56            And even if the court abused its discretion, Strong did not suffer prejudice because the court allowed Resendez's description of the shooter into evidence via Detective Olivas's police report.  Contrary to Strong's assertion on appeal, the court ruled that Resendez's on-the-scene statement to Detective Olivas was admissible as an excited utterance.  The Detective, however, could not recall the conversation with Resendez.  Accordingly, the court allowed the relevant portion of Detective Olivas's police report—Resendez's description of the shooter—to be read into evidence by Strong's trial counsel based on Rule 803(5) (Recorded Recollection).  Thus, even if the trial court committed error by precluding Resendez's statements to Lopez, Strong did not suffer prejudice because Resendez's on-the-scene description of the shooter was provided to the jury.

    2.  Defense Exhibit 1A

¶57            Strong asserts the trial court abused its discretion by issuing a limiting instruction for the admission of Defense Exhibit 1A.  He argues this prejudiced him because he was not permitted to argue that Resendez gave a detailed description of a Hispanic man a month after the murder.  Because Strong did not object at trial, we review his argument for fundamental error.  *See Johnson*, 247 Ariz. at 185 ¶ 41.

¶58            Resendez testified he worked with law enforcement to create two sketches of the suspect.  He stated he created the second sketch with YPD three weeks after the murders, and at trial, the State presented Resendez with a black-and-white copy of the sketch ("Defense Exhibit 1").  The State did not seek to admit Defense Exhibit 1 into evidence.

¶59            During the presentation of his case, Strong offered testimony from Kirk Messick, a forensic artist with the Phoenix Police Department ("PPD").  Messick testified he had met with someone one month after the murders to prepare a composite sketch for YPD.  When presented with

Defense Exhibit 1, Messick stated the exhibit was a dark photocopy of the sketch he had prepared and that it lacked the detail of the original. He then said he had the original sketch with him, and Strong sought to publish the alleged original to the jury. The State asserted it had not seen the alleged original and that Strong could not authenticate or show the relevance of the alleged original because there was no evidence that the alleged original sketch came from Resendez's description. The court allowed Strong to attempt to lay proper foundation for the admission of the sketch.

¶60          Messick testified that the alleged original sketch was signed by the person he worked with to create the sketch, but he was unable to read the signature or remember the name of that person. He could only state that the person's name was potentially "Gerald," and that the sketch was the one YPD had asked him to prepare.

¶61          The State objected, noting that Strong had still failed to lay the proper foundation for Defense Exhibit 1 because Messick could not recall who he had worked with to make the original sketch, and thus failed to connect the copy of the sketch with Resendez. The State also objected because the exhibit included a page containing extraneous information. The court removed the unnecessary page containing the extraneous information and renumbered the photocopy sketch as Defense Exhibit 1A. As to the exhibit's foundation, the State acknowledged that Resendez met with Messick, but it reiterated that Strong failed to provide proper foundation for Defense Exhibit 1A. Additionally, the State did not stipulate that Resendez met with Messick to create the underlying sketch. Lastly, the State also asserted that the exhibit was a flyer created by law enforcement and contained more information than the original sketch.

¶62          Strong then attempted to establish that the alleged original sketch and Defense Exhibit 1A were based on Resendez's description of the suspect he saw on the night of the murders. However, he was unable to do so. Strong abandoned his attempt to introduce either the alleged original sketch or Defense Exhibit 1A and stated he would try to admit Defense Exhibit 1A through other officers' testimony.

¶63          Later, Strong called YPD Detective Melissa Norred. Detective Norred testified that in July 2005 she distributed a flyer that had been prepared by "somebody from the Phoenix Police Department." She identified Defense Exhibit 1A as a copy of the flyer she had distributed, and the trial court admitted it in evidence over the State's objection.

15

¶64            On cross-examination, the State established that Detective Norred had no personal knowledge of the information on the flyer and was not present when the sketch was created. The State then requested that Defense Exhibit 1A be limited to show that Detective Norred distributed the exhibit to law enforcement agencies. Strong did not object to the State's request and the court gave a limiting instruction regarding the scope of Exhibit 1A to the jury. Strong did not object to the limiting instruction.

¶65            To introduce an exhibit, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Ariz. R. Evid. 901(a). The proponent may do this through testimony of a witness with knowledge. Ariz. R. Evid. 901(b)(1). "If the court admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly." Ariz. R. Evid. 105.

¶66            Strong has not shown that the trial court's admission of Defense Exhibit 1A for a limited purpose was error. Strong was unable to establish that the sketch was based on Resendez's description of the suspect. Although Messick testified that he had produced a sketch and that he recognized Defense Exhibit 1 as a photocopy of that sketch, he was unable to recall with whom he had met to create the sketch. Similarly, Detective Norred stated she had no personal knowledge of the information on the exhibit, did not know which officer or civilian participated in creating the sketch, and was not present when it was created. Additionally, even though Resendez had previously testified that he had met with a visiting PPD officer to create the sketch and that Defense Exhibit 1 was a copy, he could not identify the officer with whom he worked to make the sketch. The trial court did not commit error, much less fundamental error, by limiting Defense Exhibit 1A. *See Escalante*, 245 Ariz. at 142 ¶ 21 ("[T]he first step in fundamental error review is determining whether trial error exists.").

### 3. Edward Miknaitis

¶67            Strong argues the trial court erred by finding Edward Miknaitis incompetent to testify. When Strong sought to introduce the testimony of Miknaitis, a former YPD technician who assisted in processing the crime scene at the East La Mesa residence, the State objected. According to the State, Miknaitis had suffered a series of strokes since the murders and was therefore not competent to testify. But Strong asserts that insufficient evidence supported the State's position, and that precluding Miknaitis's

testimony denied him the right to present witnesses to establish a defense. *See Washington v. Texas*, 388 U.S. 14, 18–19 (1967).

**¶68**        We review a court's competency determination for an abuse of discretion. *State v. Schossow*, 145 Ariz. 504, 507–08 (1985); *State v. Griffin*, 117 Ariz. 54, 57 (1977).  And a "trial court abuses its discretion if it precludes a witness from testifying without conducting a meaningful inquiry into the witness' [sic] competency." *Zimmer v. Peters*, 176 Ariz. 426, 429 (App. 1993).

**¶69**        Generally, "[e]very person is competent to be a witness unless the[] rules [of evidence] or an applicable statute provides otherwise."  Ariz. R. Evid. 601; *see* A.R.S. § 13-4061 ("In any criminal trial every person is competent to be a witness.").  But a witness is not competent when he or she does not have the ability to perceive, recollect, or communicate about the events at issue.  *Griffin*, 117 Ariz. at 57.  "A trial court has broad discretion in determining if reasonable grounds exist for a hearing to determine a witness' [sic] competency." *Id.*

**¶70**        Here, the trial court held a hearing on Miknaitis's competency.  At the hearing, Miknaitis stated that his duties at the scene were to "find[] evidence that was there and lay[] numbers next to it" and collect items to send to the laboratory to be examined for fingerprints.  He further testified that all of the bodies, except Luis's, were found in the same bedroom, with the four children in one bed.  Miknaitis also indicated that he did not work outdoors at the East La Mesa crime scene, took no photographs at the scene, and did not wear protective gear when collecting evidence.

**¶71**        The State then called YPD Detective James Frazier to testify to the inaccuracies in Miknaitis's account of his role in the investigation.  Frazier stated that Miknaitis's role at the scene was as "a photographer and crime scene personnel."  Detective Frazier also stated that he saw Miknaitis in protective gear and identified a picture of Miknaitis at the scene with a camera and wearing protective gear.

**¶72**        Miknaitis's competency hearing revealed troubling memory lapses.  He incorrectly claimed that five of the six victims were found in one bedroom, with the four children on one bed.  When confronted with this inaccuracy, Miknaitis did not concede that his memory might be faulty but asserted that someone must have moved the bodies.  Miknaitis also testified that he did not work outside the East La Mesa residence, did not photograph the scene or any evidence, and did not wear protective gear while at the scene.  When the State showed Miknaitis a photograph of him

working outside the East La Mesa residence with a camera and wearing protective gear, however, he did not recognize himself. Nor did Miknaitis recognize a report he authored in which he admitted to photographing the crime scene.

¶73        Both parties were given the opportunity to examine Miknaitis's ability to remember his role in the investigation, and the trial court was able to determine his "capacity or ability to observe, recollect, and communicate with reference to the event in question." *See Zimmer*, 176 Ariz. at 429. Given Miknaitis's inability to accurately recollect the events at issue, the trial court did not abuse its discretion by finding him incompetent to testify.

### 4.  Defense Exhibit 43

¶74        Strong alleges the court improperly precluded admission of Defense Exhibit 43 as a business record. *See* Ariz. R. Evid. 803(6). He also argues for the first time on appeal that the exhibit was admissible under the residual hearsay exception. *See* Ariz. R. Evid. 807.

¶75        At trial, the State presented Strong's phone records, which the court admitted. After YPD Detective John Gawler testified about the phone records, Strong attempted to introduce Defense Exhibit 43, which purportedly consisted of witness Ada Harris's phone records from Virgin Mobile.[5] The State objected, arguing that no custodian of records could authenticate the records. The trial court allowed Strong to attempt to lay the necessary foundation for the records.

¶76        Detective Gawler stated that, although he had seen the phone records in Defense Exhibit 43 before and used them as a reference in producing a timeline of Strong's phone calls ("Exhibit 957"), he had only used the records to verify calls shown on Strong's phone records.

¶77        The State then argued that Defense Exhibit 43 did not provide any additional information regarding Strong's phone calls that was not contained in Exhibit 957. In response, Strong asserted that Exhibit 957 was incomplete because it did not show which of Harris's calls were answered and which went to voicemail. The State reiterated that, although it did not dispute that the phone number on the records was Harris's, proper foundational testimony for the admission of Defense Exhibit 43 was not

---

[5] After the murders, Harris gave Strong a ride from a Circle K to Sanguinetti Park, where Luis's Durango was later found.

provided. The court concluded that Strong had failed to lay sufficient foundation for the records' admission and denied admission of Defense Exhibit 43.

### i. Business Records

¶78 Strong argues that the trial court improperly precluded admission of Defense Exhibit 43 as a business record because (1) testimony from various police detectives established that YPD obtained the records from Virgin Mobile during its investigation and (2) the State did not dispute the authenticity of the records. Because Strong asserted the business records exception at trial, if we find error, we review for harmless error. *Henderson*, 210 Ariz. at 567 ¶ 18. We begin our analysis by determining whether the trial court erred by precluding the exhibit. *See State v. Dunbar*, 550 P.3d 142, 150 ¶¶ 29–30 (Ariz. 2024) (stating that any error review must begin by determining whether error occurred).

¶79 "The business records exception requires that the record be made at or near the time of the entry by or from information transmitted by someone with knowledge, be kept in the ordinary course of business, be made as a regular practice, and be testified to by a qualified witness." *State v. Parker*, 231 Ariz. 391, 401 ¶ 28 (2012); Ariz. R. Evid. 803(6).

¶80 Here, the trial court did not err by precluding admission of Defense Exhibit 43 as a business record. Contrary to Strong's assertions, testimony from various police officers was insufficient to lay the necessary foundation to admit Defense Exhibit 43 as a business record. Although the officers could testify that they acquired the records from Virgin Mobile during their investigation, they could not establish that the records were "made at or near the time of the entry by or from information transmitted by someone with knowledge," "kept in the ordinary course of business," or "made as a regular practice." *See Parker*, 231 Ariz. at 401 ¶ 28; Ariz. R. Evid. 803(6). Accordingly, the officers could not qualify the exhibit as a business record. Although the State did not dispute that the phone number on the records was Harris's, this does not establish their admissibility in the absence of qualified witness testimony.

### ii. Residual Exception to Hearsay

¶81 Strong also argues the court erred by precluding the admission of Defense Exhibit 43 because the exhibit was admissible under the residual exception to hearsay. *See* Ariz. R. Evid. 807. Because Strong

did not raise the residual exception to hearsay issue at trial, we review for fundamental error. *Johnson*, 247 Ariz. at 185 ¶ 41.

**¶82**        Under the residual exception to hearsay, a hearsay statement that is not admissible under an exception in Rule 803 or 804 is not excluded by the rule against hearsay if: "(1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement;" and "(2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Ariz. R. Evid. 807(a).

**¶83**        Strong has not shown that both requirements for the residual exception to hearsay were met. He argues that the State agreed that Defense Exhibit 43 concerned Ada Harris's phone activity and that the records were genuine. But the State merely did not *dispute* that the phone number on the records was Harris's. Although the records may have been more probative than other evidence as to whether calls to Harris went to voicemail, "sufficient guarantees of trustworthiness" were not presented. Accordingly, preclusion of Defense Exhibit 43 did not constitute error.

### D.  Juror Misconduct

**¶84**        Strong argues that Juror 47's knowledge of the Gill Murder, prior to serving as a juror in the La Mesa case, deprived him of his constitutional right to a fair trial.

**¶85**        After the verdict, Strong moved for a new trial under Arizona Rule of Criminal Procedure 24.1, alleging, among other claims, that Juror 47 had knowledge of Strong's previous conviction for the Gill Murder. This claim was based on a conversation that Strong's attorney had with Juror 47 at the conclusion of the trial. Strong's attorney alleged that Juror 47 told him information that indicated she "intentionally or otherwise failed to inform court and counsel that she knew of the Gill Murder conviction before being impanelled [sic] in this matter." A defense investigator then spoke with Juror 47 about her knowledge of the Gill Murder. The investigator's notes regarding his conversation with Juror 47 were attached to Strong's motion for a new trial. In his motion, Strong argued that he had "been denied basic procedural safeguards regarding a juror that the court certainly would have excused and/or that the defense would not have had to spend a preemptive challenge."

¶86        Strong later filed a Rule 24.2 motion to vacate the judgment, asserting the same claims as under the Rule 24.1 motion. At a hearing on both motions, the trial court limited the proceeding to arguments from counsel and did not allow Strong's investigator to testify. After the hearing, Strong filed a supplement to both motions arguing that the trial court should hold an evidentiary hearing regarding the juror misconduct issue pursuant to *Godoy v. Spearman*, 861 F.3d 956, 959 (9th Cir. 2017).

¶87        The trial court denied Strong's Rule 24.1 motion as untimely. The court also denied Strong's Rule 24.2 motion, concluding that Juror 47 "did not intentionally fail to disclose her knowledge of the Gill Murder and no misconduct occurred." Moreover, the court found that Strong had failed to show his verdict was influenced by Juror 47's knowledge of the Gill Murder, and that Strong had also failed to show prejudice "because one juror was aware of his prior conviction before the aggravation phase of the trial."

### 1. Evidentiary Hearing

¶88        Following Strong's initial appeal on this issue, we remanded the case to the trial court with instructions "to hold an evidentiary hearing to determine the circumstances of Juror 47's alleged misconduct and knowledge of the Gill Murder and prior conviction." At this hearing, the trial court heard testimony from Juror 47 and other witnesses. When questioned about her knowledge of the Gill Murder—by both defense counsel and the State—Juror 47 testified that she knew about the Gill Murder from reading contemporaneous press accounts about the case. But she stated that she did not remember that Strong committed the Gill Murder when questioned during jury selection for the La Mesa Murder trial. Juror 47 informed the court she did not remember that Strong had been convicted of the Gill Murder until the State presented evidence of that homicide during the aggravation phase.

¶89        After the hearing, the trial court found that Juror 47 "did not remember Strong's previous conviction of the Gill murder at the time of jury selection or during the trial." The court also concluded that "although Juror 47 knew of the Gill case at the time of the murder and subsequent conviction, she had forgotten that Strong was the person convicted of Gill's murder" and "did not realize that Strong had been convicted of the Gill murder until the aggravation phase of the trial." The court further found "Juror 47's testimony to be credible" and that "[s]he did not appear to be deceptive or evasive in her responses on direct or cross examination." Thus, the court did *not* find "there was any prejudicial information known

to Juror 47 during the trial that would even begin the two-step process laid out to this court by the [Arizona] Supreme Court." Consequently, the court denied Strong's motion to vacate judgment and motion for a new trial.

### 2. *Godoy* Juror Misconduct Test

**¶90** Under Arizona Rule of Criminal Procedure 24.2(a)(2), (3) (2017),[6] a court may vacate a judgment when "newly discovered material facts exist under the standards in Rule 32.1," or if "the conviction was obtained in violation of the United States or Arizona Constitutions." And criminal defendants are constitutionally entitled to be tried by an impartial jury. U.S. Const. amends. VI, XIV. A jury's verdict must be based on evidence presented and developed at trial, free from outside influences. *State v.* (*Rudy R.*) *Miller*, 178 Ariz. 555, 557 (1994).

**¶91** When a defendant alleges that a juror is improperly exposed to external information, we apply a two-step framework based on *Mattox v. United States*, 146 U.S. 140 (1892), and *Remmer v. United States*, 347 U.S. 227 (1954). *Godoy*, 861 F.3d at 959. Under this framework, the trial court must first determine whether the alleged external information *known to the juror* was "possibly prejudicial," meaning it tended to be injurious to the defendant. *Id.* (quoting *Mattox*, 146 U.S. at 150). If so, a presumption of prejudice arises, and, at the second step, the state must then rebut the presumption by showing that the information was harmless. *Id.* If the state cannot make a showing of harmlessness, then the defendant is entitled to a new trial. *Id.* But if "the presumption arises but the prejudicial effect of the external information is unclear from the existing record, the trial court must hold a 'hearing' to 'determine the circumstances [of the contact], the impact thereof upon the juror, and whether or not it was prejudicial.'" *Id.* (alteration in original) (quoting *Remmer*, 347 U.S. at 229–30).

**¶92** In our Decision Order, we concluded that this "analytical framework should be applied to the circumstances and allegations presented in this case, involving precluded external information about the [Gill] murder and Strong's [subsequent] conviction." We then found that because Strong established a presumption of prejudice based on the investigator's notes regarding his conversation with Juror 47 after the trial, he was entitled to a hearing to determine whether he was prejudiced by Juror 47.

---

[6] We cite to the 2017 edition of Rule 24 because this was the version in force at the time of Strong's motions and the trial court's rulings.

¶93          Based on the evidentiary hearing held on remand, we conclude that the court did not abuse its discretion in finding no juror misconduct.  *See Burns*, 237 Ariz. at 26 ¶ 112 (explaining that when a defendant alleges jury misconduct and moves for a new trial, we will not reverse the trial court's ruling absent an abuse of discretion); *see also* (*Rudy R.*) *Miller*, 178 Ariz. at 557 (finding an abuse of discretion when a trial court did not hold an evidentiary hearing despite a "substantial risk of prejudice" from jurors' exposure to external information).

¶94          In concluding that Juror 47 was not influenced in the trial's guilt phase by external information—i.e., knowledge that Strong committed the Gill Murder—the trial court acknowledged that the *Godoy* analysis we instructed the court to apply "cannot begin unless and until the court determines that the juror had information and possibly could have used that information during the trial."  The court continued, explaining that the "threshold question, therefore, [wa]s whether Juror 47 was still aware of [Strong's association with the Gill Murder] at the time of jury selection or during her service as a juror prior to that information being provided during the aggravation phase of the trial."  Based on the record developed at the hearing, the court concluded that "Juror 47 did not realize that Strong had been convicted of the Gill murder until the aggravation phase of the trial."  Moreover, Juror 47 did not communicate with other jurors about the Gill Murder once she realized the connection.

¶95          In its order, the trial court correctly noted that—before determining whether alleged improper information was prejudicial—it must establish what was "known to the juror" at the time of trial.  When we remanded this case for an evidentiary hearing, we assumed—based on the investigator's notes attached to Strong's motion for a new trial—that Juror 47 remembered that Strong was the perpetrator of the Gill Murder while she served as a juror on the La Mesa Murder trial.  But faced with a fully developed record on remand, the trial court determined, as an initial matter, that Juror 47 did not remember Strong's conviction for the Gill Murder at the time of jury selection or during the guilt phase of the trial. The court further found that Juror 47 did not realize that Strong had been convicted of the Gill Murder until the State presented evidence of this fact at the aggravation phase of the trial.  These findings are supported by the record and are not clearly erroneous. *State v. Hulsey*, 243 Ariz. 367, 377 ¶ 17 (2018) ("We defer to a trial court's findings of fact when they are supported by the record and not clearly erroneous . . . .").  At bottom, Strong was not prejudiced because Juror 47 did not remember his prior murder conviction until that fact was admitted at the aggravation phase. *See State v. Nelson*, 229 Ariz. 180, 184 ¶ 12 (2012) ("[P]rejudice cannot be presumed without the

requisite showing that the jury received and considered extrinsic evidence on the issues." (quoting *Davolt*, 207 Ariz. at 208 ¶ 59)). Accordingly, we conclude that the court did not abuse its discretion in finding no juror misconduct.

### E. DNA Evidence

¶96        Strong argues that the DNA results obtained from analyzing evidence taken from the steering wheel of Luis's Dodge Durango was the product of unreliable principles and methods and should have been excluded from trial. He cites *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Arizona Rule of Evidence 702 as authority for this claim.

¶97        "We review a trial court's decision whether to admit DNA evidence for an abuse of discretion and in the light most favorable to sustaining its ruling." *State v. Gomez*, 250 Ariz. 518, 521 ¶ 13 (2021). But an "error of law committed in reaching a discretionary conclusion may, however, constitute an abuse of discretion." *Johnson*, 247 Ariz. at 186 ¶ 45 (internal quotation mark omitted) (quoting *State v. Wall*, 212 Ariz. 1, 3 ¶ 12 (2006)).

¶98        Before trial, Strong sought to prevent the State from presenting evidence showing that he was a major contributor of DNA found on the steering wheel of Luis's Dodge Durango. In support of this motion, Strong presented a report by a forensic scientist, Debra Epstein, that challenged the methodology used by the Department of Public Safety ("DPS") in testing the DNA material.

¶99        The trial court held an evidentiary hearing on Strong's motion. At the hearing, former DPS forensic scientist Lorraine Heath testified about the protocols and procedures she followed when she performed the DNA analysis. Strong presented testimony by Epstein. After the hearing, the court denied Strong's motion.

¶100        Here, Strong asserts that the trial court erred by admitting the DNA evidence because Heath did not follow accepted scientific methods and protocols when she conducted her analysis. And he claims that this unfairly prejudiced him because the DNA evidence was the only evidence that linked him to Luis's Durango, which was used to advance the State's theory that Strong drove Luis's Durango to Sanguinetti Park after the

murders.[7]  Specifically, Strong argues that the DNA evidence was inadmissible because Heath: (1) used the wrong standard cut off for testing;[8] (2) should not have combined samples unless she knew the samples were collected from the same area; (3) did not preserve some of the DNA swabs in their original state before testing; and (4) did not preserve all notes used to generate data, including her calculations, for peer review. We disagree.

¶101         Arizona Rule of Evidence 702 allows an expert witness to testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

"Trial courts serve as the 'gatekeepers' of admissibility for expert testimony, with the aim of ensuring such testimony is reliable and helpful to the jury." *State v. Romero*, 239 Ariz. 6, 9 ¶ 12 (2016) (quoting Ariz. R. Evid. 702 cmt. to 2012 amendment).  However, the court's "gatekeeping role is not intended to displace the jury's fact-finding role, which includes assessing the weight and credibility of testimony and resolving any evidentiary conflicts."  *State v. Rojo-Valenzuela*, 237 Ariz. 448, 451 ¶ 11 (2015).  "In close cases, the trial court should allow the jury to exercise its fact-finding function, for it is the jury's exclusive province to assess the

---

[7]  Strong also asserts that admission of the evidence denied him his constitutional right to due process as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and article 2, sections 23 and 24 of the Arizona Constitution.  However, because Strong did not cite authority or present an argument on the due process issues, he has waived them. *See Johnson*, 247 Ariz. at 194 ¶ 91.

[8]  Here, the "standard cut off for testing" refers to a minimum analytical threshold for data comparisons between a DNA profile and a DNA sample. *See Amplified DNA Product Separation for Forensic Analysts: Glossary*, Nat'l Inst. of Just., (July 21, 2023) https://nij.ojp.gov/nij-hosted-online-training-courses/amplified-dna-product-separation-forensic-analysts/glossary#analytical-threshold.

weight and credibility of evidence." *State v. Bernstein*, 237 Ariz. 226, 230 ¶ 18 (2015).

**¶102**     Here, the trial court did not abuse its discretion by admitting the DNA evidence.  Although Strong's expert asserted Heath violated protocol by using the wrong standard cut off for testing, Heath testified that DPS protocol gave her the authority to determine an appropriate threshold. Heath further testified that, based on her knowledge and experience, she felt that the threshold level used was appropriate.  She also noted that the DPS crime lab and its procedures were accredited by the American Society of Crime Lab Directors Laboratory Accrediting Board and approved under the FBI's quality assurance standards.  Heath further stated that even if she had used a higher threshold level only one sample would have been excluded—and therefore the impact of using a higher threshold would have been minimal.

**¶103**     Next, Strong asserts that Heath violated protocol by improperly combining DNA samples.  However, Heath testified that it was standard procedure to combine swabs from the same area, especially when looking for touch DNA, in order to maximize the ability to detect the DNA that is present.  Heath further stated that, based on her knowledge and the sensitivity of the testing at the time, using all the samples was an appropriate method to maximize the possibility of getting an interpretable DNA sample.

**¶104**     Strong also claims that Heath violated protocol by failing to preserve some of each swab in its original state before testing.  Heath testified that, although the cotton swabs had been consumed, DNA extract remained and could be tested by the defense.  Heath also stated that according to the DPS policy in effect at the time she conducted her analysis, an investigator could give her permission to consume the entire sample and she had received that authorization.

**¶105**     Finally, Strong argues that Heath violated protocol by failing to preserve all notes used to generate data, including her calculations for peer review.  Heath stated she did the calculations but did not include them in her report because that was the standard practice at the time.  Heath further confirmed all her work was approved following technical and administrative review to verify proper procedures.

**¶106**     The testimony presented at the evidentiary hearing supports the trial court's conclusion that Heath's expert testimony regarding the DNA evidence was: (1) based on sufficient data using reliable scientific

principles and methods; (2) relevant and would assist the jury; and (3) was more probative than prejudicial. Strong fails to show that testimony presented at the hearing, when viewed in the most favorable light, does not support the court's conclusion. Strong further fails to show that the trial court committed any legal error when admitting the DNA evidence. Accordingly, he fails to show that the trial court abused its discretion in admitting the DNA evidence.

### F. Argument Between Luis And Strong

¶107        Strong argues that the trial court committed fundamental error by admitting testimony from Soto, Luis's cousin, because the testimony was: (1) inadmissible other-act evidence under Arizona Rule of Evidence 404(b); (2) irrelevant under Rule 401; and (3) more prejudicial than probative under Rule 403.

¶108        Before trial, Strong moved to preclude Soto's testimony about an argument he heard between Strong and Luis. Regarding this argument, Soto told police officers that one month before the murders, he visited Luis at the RC Liquor Store and heard what sounded like an argument in the back of the store. He said he then saw Strong and Luis leave the back of the store and asked Luis what had happened. Soto said Luis told him that Strong "was kind of upset" because Luis had refused to loan Strong more money and that Strong already owed Luis $50,000.

¶109        In his motion to preclude Soto's testimony, Strong argued Soto's statements were hearsay and did not fall within a hearsay exception.[9] The State argued Luis's statements to Soto were admissible because they fell within the excited-utterance, present-sense-impression, and statements-against-interest exceptions to hearsay. Additionally, the State argued the statements were non-hearsay because they were being offered to explain why Luis was emotionally upset at the time he interacted with Soto—i.e., to show Luis's state of mind—and not to prove the truth of the matter asserted therein. Finally, the State argued that the statements also went to Strong's state of mind. In reply, Strong reasserted that Luis's statements were hearsay without an exception.[10]

---

[9] Although the State and the court also addressed whether evidence of Soto's observations was admissible, Strong only argued that Soto's testimony regarding Luis's statements was inadmissible.

[10] Strong also argued in reply that Luis's statements were stale because Soto did not report them to police until 2014, but he does not raise this argument on appeal.

¶110    The trial court denied Strong's motion.  The court found that Luis's statements to Soto fell within the present-sense-impression exception to hearsay because Luis perceived and participated in the argument and made the statement to Soto immediately after it occurred.  *See* Ariz. R. Evid. 803(1).

¶111    On appeal, Strong does not assert that the trial court erred by finding that Luis's statements to Soto were admissible as present sense impressions.  Instead, he contends that Soto's testimony was inadmissible "other act" evidence under Rule 404(b), that it was not relevant, and that its prejudicial effect outweighed its probative value.  We review this claim for fundamental error because Strong did not raise this objection at trial.  *See Hulsey*, 243 Ariz. at 381 ¶ 38 (reviewing for fundamental error because a party "failed to specifically object in the trial court to any admission of evidence on 404(b) grounds").

¶112    When admitting evidence of other acts, the evidence must: (1) be relevant, (2) be admitted for a proper purpose under Rule 404(b), and (3) satisfy Rule 403 balancing.  *State v. Mott*, 187 Ariz. 536, 545 (1997).  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Ariz. R. Evid. 401.  "Unfair prejudice means an undue tendency to suggest decision on an improper basis, . . . such as emotion, sympathy or horror."  *State v. Hardy*, 230 Ariz. 281, 290 ¶ 40 (2012) (alteration in original) (quoting *State v. Schurz*, 176 Ariz. 46, 52 (1993)).  The greater the probative value of the evidence, the less likely such value will be substantially outweighed by unfair prejudice.  *Shotwell v. Donahoe*, 207 Ariz. 287, 296 ¶ 34 (2004).

¶113    Strong has not shown that the admission of Soto's testimony was error, let alone fundamental error.  First, the testimony was relevant because it had a tendency to show Strong had motive to murder the victims, a fact of consequence in determining whether Strong acted intentionally and with premeditation.  *See* Ariz. R. Evid. 401; *see also* A.R.S. § 13-1105(A)(1) (defining first degree murder to include intentional and premeditated killing).

¶114    Second, Soto's testimony would have been admissible under Rule 404(b).  The State did not introduce the testimony to show that Strong acted in conformity with his character, but rather to establish Strong's potential motive.  Such use is permissible under Rule 404(b).  *See State v. Via*, 146 Ariz. 108, 122 (1985).

¶115 Finally, the testimony's probative value substantially outweighed its prejudicial effect. Strong's motive and intent were significant issues at trial. Therefore, Luis's statements indicating that he and Strong argued, Strong was "upset," and that Strong owed Luis money all had sufficient probative value. Although Strong argues the testimony was unduly prejudicial because no other evidence showed Strong owed Luis $50,000, other contradictory testimony regarding Strong's financial state was presented. Soto's testimony thus constituted conflicting evidence for the jury to consider. *See Doe v. Roe*, 191 Ariz. 313, 327 ¶ 45 (1998) (recognizing that weighing conflicting evidence is the jury's function). Moreover, Soto's testimony was not inflammatory, *see State v. Lee*, 189 Ariz. 608, 614 (1997) (noting testimony did not use inflammatory language when weighing testimony's prejudicial value), and did not tend to encourage judgment on emotion, sympathy, horror, or any other improper basis. Although the testimony was not favorable to Strong, that, taken alone, is insufficient to render the testimony unduly prejudicial. *Schurz*, 176 Ariz. at 52 (explaining that "not all harmful evidence is unfairly prejudicial" because "evidence which is relevant and material will generally be adverse to the opponent").

¶116 Even if the trial court erred in admitting Soto's testimony, we do not find the alleged error was "of such a magnitude that [the] defendant could not possibly have received a fair trial" or that Strong was prejudiced by the testimony's admission. *See Escalante*, 245 Ariz. at 140–41 ¶ 16 (internal quotation mark omitted) (quoting *Henderson*, 210 Ariz. at 567 ¶ 20). Although improperly admitted hearsay evidence may be grounds for reversal if such evidence was the "sole proof of an essential element of the state's case," *State v. McGann*, 132 Ariz. 296, 299 (1982), the State—as Strong acknowledges—presented other evidence of Strong's financial troubles and debts to Luis. Strong argues he was prejudiced because only Soto's testimony indicated that Strong owed Luis $50,000. This only means that Soto's testimony was conflicting evidence for the jury's consideration. Because the alleged error did not prejudice Strong, fundamental error has not been established, and reversal is not warranted. *See Bible*, 175 Ariz. at 599.

### G. Ramon Curiel

¶117 Strong asserts that the trial court erred (1) by admitting Curiel's testimony and a redacted letter written by Curiel—both stating that Strong confessed to the La Mesa Murders—because they were unduly

prejudicial, and (2) for failing to sua sponte preclude Curiel's testimony and letter as hearsay.

¶118     Because Strong objected on the basis of undue prejudice at trial, we review for harmless error.  *See Henderson*, 210 Ariz. at 567 ¶ 18.  However, because Strong did not argue at trial that the letter and testimony were hearsay, we review those arguments for fundamental error.  *See State v. Goudeau*, 239 Ariz. 421, 457 ¶ 144 (2016).  We consider "only the evidence presented at the suppression hearing and view[] it in the light most favorable to sustaining the trial court's ruling."  *State v. Primous*, 242 Ariz. 221, 223 ¶ 10 (2017); *see State v. Superior Court*, 128 Ariz. 583, 585 (1981) ("In criminal cases, a motion in limine is treated as a motion to suppress . . . .").

¶119     In 2015, Curiel, an inmate at the Arizona Department of Corrections, wrote a letter to the Yuma City Attorney saying that he would be willing to testify against Strong in exchange for early release from his prison sentence.  In the letter, Curiel recounted a 2013 conversation with Strong while both men were in prison.  According to Curiel's letter, Curiel had asked Strong whether he was still a suspect in the La Mesa Murders, and Strong replied that he was but that he would never be convicted because he had been too careful.

¶120     Strong moved to preclude Curiel's testimony and letter, arguing that Curiel's testimony and the information contained in the letter would inform the jury that Strong was in prison when their conversation took place and would therefore be unduly prejudicial.

¶121     The trial court denied the motion to preclude, determining that Curiel's testimony was relevant and that the reliability of his testimony went to "the weight of the statements and not their admissibility."  The court also concluded Curiel's testimony could be properly sanitized to remove any prejudicial material.  The court also admonished Curiel before he testified that he was not to mention the fact that Strong was in custody or that Strong had any prior felony convictions.

¶122     Regarding Curiel's letter, the court determined that the letter could be sanitized to remove any indication that the conversation referenced therein took place in prison.  The court allowed the admission of the redacted letter and instructed the jury not to concern itself with the reasons for or contents of the redactions.

¶123     When considering evidence, the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger

of . . . unfair prejudice." Ariz. R. Evid. 403. Adverse evidence is not necessarily unfairly prejudicial, however, because relevant and material evidence will almost always be harmful to an opponent. *Schurz*, 176 Ariz. at 52. Moreover, courts may mitigate the prejudicial impact of evidence with proper jury instructions. *See State v. Leteve*, 237 Ariz. 516, 523 ¶ 17 (2015).

¶124 Here, the court did not abuse its discretion in admitting Curiel's testimony and the redacted letter. Both the testimony and letter had probative value because they showed Strong's involvement in the La Mesa Murders. In contrast, the danger of unfair prejudice was minimal because the admission of the redacted letter was not based on an improper reason, such as emotion or sympathy. Further, the trial court properly instructed the jury not to consider the reasons for or content of the redactions, thus mitigating any prejudicial impact. We presume the jury follows the court's instructions. *State v. Dann* ("*Dann I*"), 205 Ariz. 557, 570 ¶ 46 (2003). Thus, the trial court did not abuse its discretion by concluding that Curiel's testimony and the redacted letter's probative value outweighed the danger of unfair prejudice.

¶125 Strong also argues the court fundamentally erred by admitting Curiel's testimony and redacted letter because they constituted hearsay with no indicia of reliability. Specifically, Strong asserts his own statement contained in the letter was not an admission because there was no evidence that he actually made the statement Curiel reported. This argument fails.

¶126 While hearsay is generally inadmissible, an opposing party's statement is not hearsay. Ariz. R. Evid. 801(d)(2). "Party admissions require no external indicia of reliability." *State v. Garza*, 216 Ariz. 56, 66 ¶ 41 (2007). They need only be offered against and made by the opposing party. Ariz. R. Evid. 801(d)(2).

¶127 Strong's statements to Curiel, as reflected in Curiel's testimony and letter, were made by Strong and were properly offered against him as a party admission under Rule 801(d)(2)(A). Accordingly, the court did not err by admitting the statements. Because Strong has not shown trial error, he has failed to show the court committed fundamental error. *See Escalante*, 245 Ariz. at 142 ¶ 21.

### H. Admission Of Timeline Evidence

¶128      Strong asserts that the court denied him his right to due process by admitting Exhibits 957, 958, 959, and 960 without providing him the opportunity to review and rebut them, citing *State v. Krone*, 182 Ariz. 319 (1995).  He argues the error was prejudicial because the late disclosure prevented him from developing his own exhibit to rebut the State's timelines.

¶129      Strong objected at trial to Exhibits 957, 958, and 959, and so we apply harmless error review.  *See Henderson*, 210 Ariz. at 567 ¶ 18.  Only if we find error do we then assess the objected-to error for harm.  *See Dunbar*, 550 P.3d at 150 ¶¶ 29–30.  Because Strong did not object to Exhibit 960 at trial, however, we review that claim for fundamental error.  *Johnson*, 247 Ariz. at 185 ¶ 41.

¶130      During trial, Strong advised the court that the State recently disclosed three timeline exhibits that it proposed to admit into evidence.  The timelines were created by Detective Gawler based on previously admitted call records from Adrienne, Luis, and Strong, respectively.

¶131      Strong objected to the disclosures, arguing the exhibits were not timely disclosed and may be misleading.  The State agreed that Strong should have additional time to review the exhibits and explained that it disclosed the exhibits to Strong immediately after receiving them from YPD.  The State further explained it could not have sought admission of the exhibits earlier because the information displayed in the charts had not yet been established by testimony, but in any event it had disclosed another version of the timeline to Strong "years ago."  The State asserted that all the contents of each exhibit were supported by previous testimony, and it repeated that Strong should have additional time to verify the exhibits' contents.  The court did not permit the State to present the exhibits at that time.

¶132      Two days later, the State notified the court that it intended to call Detective Gawler, who created Exhibits 957, 958, and 959, to testify.  Strong again objected, arguing that although the timelines appeared to be accurate, they were misleading because they did not contain "a lot of other things that should have been on there in order to form a complete picture."  Over Strong's objection, the court ruled that the State could use Exhibits 957, 958, and 959.  Strong did not object when the State moved to admit Exhibit 960, which consisted of charts providing hourly breakdowns for

calls to and from Strong's phone.  Detective Gawler testified regarding each of these exhibits and was subjected to cross-examination by Strong.

¶133       Pursuant to Arizona Rule of Criminal Procedure 15.7 (2017),[11] if a party fails to make timely disclosures, the court may impose sanctions—including precluding or limiting the use of evidence.  Upon a motion by a party "[t]he court shall order disclosure and shall impose any sanction it finds appropriate, unless the court finds [1] that the failure to comply was harmless or [2] that the information could not have been disclosed earlier even with due diligence and the information was disclosed immediately upon its discovery."  Ariz. Crim. P. 15.7(a) (2017).  "All orders imposing sanctions shall take into account the significance of the information not timely disclosed, the impact of the sanction on the party and the victim and the stage of the proceedings at which the disclosure is ultimately made."  *Id.*

¶134       Here, the trial court did not abuse its discretion by admitting Exhibits 957, 958, and 959.  As to Exhibits 958 and 959, though the court did not expressly state on the record "that the failure to comply was harmless or that the information could not have been disclosed earlier," *id.*, it is apparent from the record that Detective Gawler's testimony supported the State's assertion that it had produced the exhibits as soon as it had received them from YPD.  Detective Gawler's testimony also established that he created the exhibits from previously admitted call records—rather from any new evidence—thereby mitigating any prejudice to Strong.  As to Exhibit 957, the court concluded that "the information contained within the exhibit was timely disclosed," that the State disclosed the exhibit as soon as it had received it from YPD, and that the State had previously disclosed to Strong another version of the timelines.  Moreover, the court granted Strong ample time—five days—to review the exhibits before they were admitted.

¶135       Strong's reliance on *Krone* is equally unavailing.  In *Krone*, this Court considered the appropriate remedy for the state's disclosure of an exhibit on the eve of trial. 182 Ariz. at 321.  The exhibit at issue in *Krone* was a videotape prepared by a dental expert to show that bite marks on the victim matched the defendant's teeth.  *Id*. at 320.  This Court concluded that "the trial court should have either granted a continuance or precluded the tape when first asked to do so" and that "a discovery sanction should be proportionate to the harm caused."  *Id*. at 322.

---

[11]  We cite the version in effect at the time of trial, which did not expressly state a requirement for the court to first find a disclosure violation.

¶136     Here, Strong argues that the trial court's admission of Exhibits 957, 958, and 959 contravenes *Krone* and that the court should have precluded the timeline exhibits based on the State's late disclosure. However, Strong had five days to review the three exhibits and to compare them to the information that had been previously disclosed to him. Moreover, Strong does not contend that this time was insufficient to review the exhibits or that his cross-examination of Detective Gawler was compromised based on the State's late disclosure.

¶137     As previously noted, "a discovery sanction should be proportionate to the harm caused." *Id.* Here, any possible harm caused by the late disclosure of the timeline exhibits was minimal and was cured by the trial court's order delaying the admission of the exhibits. Because we cannot say that "no reasonable judge would have reached the same result under the circumstances," *State v. Naranjo*, 234 Ariz. 233, 242 ¶ 29 (2014) (quoting *State v. Armstrong*, 208 Ariz. 345, 354 ¶ 40 (2004)), we conclude the trial court did not abuse its discretion by admitting Exhibits 957, 958, and 959.

¶138     Finally, as to Exhibit 960, Strong does not explain or develop his argument that its admission was fundamental error; he has therefore failed to carry his burden on fundamental error review. *See Escalante*, 245 Ariz. at 142 ¶ 21. He also asserts that admission of this evidence denied him his constitutional right to due process as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and article 2, sections 23 and 24 of the Arizona Constitution. However, because Strong did not cite authority or present an argument on the due process issues, he has waived them. *See Johnson*, 247 Ariz. at 194 ¶ 91.

## I. Death Penalty

¶139     Strong argues that imposition of the death penalty was improper and unconstitutional because: (1) the court improperly instructed the jury to consider whether the murders were committed in a cold and calculated manner; (2) the victim impact statements unfairly prejudiced him; (3) the aggravating factor of committing multiple homicides was not proven; and (4) an independent review of the imposition of the death penalty mandates commutation to life imprisonment. He also asserts imposition of the death penalty in this case violated both the Eighth Amendment of the United States Constitution and article 2, section 24 of the Arizona Constitution.

1.  Cold-and-Calculated Aggravating Factor

**¶140**      Strong asserts that the trial court erred by instructing the jury regarding the cold-and-calculated aggravating factor and allowing the State to present that factor.  Because Strong did not object to perceived error during the aggravation phase, we review for fundamental error.[12]  *See Johnson*, 247 Ariz. at 185 ¶ 41.  Although we agree that the court's instruction regarding the aggravating factor was erroneous, we do not find it rises to the level of a fundamental error.

**¶141**      The State alleged, and the jury found, that Strong committed each murder in a "cold, calculated manner without pretense of moral or legal justification." § 13-751(F)(13).  This finding was erroneous because the murders were committed before the effective date of the (F)(13) factor.

**¶142**      But before beginning the penalty phase, the trial court realized this error and proposed instructing the jury that it "must disregard [its] finding [of the (F)(13) factor] and no longer consider it in making [its] sentencing determination."  Because neither the State nor Strong objected to this resolution, the court so instructed the jury at both the beginning and the end of the penalty phase.

**¶143**      Certain instructional errors may constitute fundamental error.  *See, e.g.*, *State v. King*, 158 Ariz. 419, 425 (1998) ("Where, under the facts of the case, the error affects the primary or sole issue, we are likely to find fundamental error."); *State v. Hunter*, 142 Ariz. 88, 90 (1984) (holding that improper burden shifting to a defendant constitutes fundamental error).  These errors are generally so significant they undermine the foundation of a case or render a fair trial impossible.  *See King*, 158 Ariz. at 424–25.

**¶144**      Here, though giving the cold-and-calculating instruction was error, the instruction did not fundamentally undermine the trial.  The error did not affect the primary or sole issue in the case—this was not the only aggravator alleged.  The State alleged, and the jury also found, three aggravating circumstances under § 13-751(F)(1), (8), and (9).  Also, the State presented no additional evidence to support the (F)(13) aggravating factor.  During the aggravation phase, the State argued that (F)(13) had been established by the evidence already presented during the guilt phase of the

---

[12] Strong first asserted this claim in a post-trial motion, but "an untimely objection first raised in a motion for a new trial does not preserve an issue for appeal." *State v. Davis*, 226 Ariz. 97, 100 ¶ 12 (App. 2010).

trial. Moreover, the instruction did not improperly shift the burden to Strong. And finally, and of critical importance here, the court cured the error by clearly and unequivocally instructing the jury—at both the beginning and end of the penalty phase—to disregard the (F)(13) factor in its entirety. *See State v. Newell*, 212 Ariz. 389, 403 ¶ 68 (2006) ("We presume that the jurors followed the court's instructions.").

¶145 In short, the erroneous instruction did not go to the foundation of the case, deprive Strong of a right essential to his defense, or deny him a fair trial. *See Escalante*, 245 Ariz. at 142 ¶ 21. Accordingly, the trial court's erroneous instruction regarding the cold-and-calculating aggravating factor does not constitute a fundamental error.

### 2. Victim Impact Statements

¶146 Strong asserts that two comments in the victim impact statements unfairly prejudiced him. Specifically, he argues: (1) that a victim's statement characterizing the murders as a "satanic act" was unduly prejudicial; and (2) that another victim's assertion that Strong "deserve[d] what's coming to [him], if not worse" offered an impermissible opinion regarding the appropriate sentence to be imposed.[13] He alleges the victim impact statements were not only highly inflammatory and prejudicial, but were especially prejudicial because the trial court instructed the jury to consider them to rebut his mitigation.

¶147 Four family members gave victim impact statements, including Luis's adult daughter, Amanda Rios, and A.C.'s and E.B.'s father, Ken Crawford. In his statement, Crawford told the jury that the murders were "a disgrace, a shameless, satanic act." Amanda told Strong: "You deserve what's coming to you, if not worse. You've ruined multiple lives including the ones related or connected with the deceased." Strong objected and moved for a mistrial asserting these statements were inappropriate. The trial court denied Strong's mistrial motion.

¶148 Victim impact evidence is admissible during the penalty phase of a capital trial to rebut a defendant's mitigation evidence. *See* Ariz. Const. art. 2, § 2.1(A)(4) (entitling a victim to be heard at sentencing); A.R.S. § 13-752(R) (allowing victim to present information during penalty phase

---

[13] Strong also states the "satanic" statement violated the "mandate" in *State v. Comer*, 165 Ariz. 413 (1990). However, *Comer* does not address victim impact statements, and Strong provides no citation or explanation to which "mandate" he refers.

"about the murdered person and the impact of the murder on the victim and other family members"); Ariz. R. Crim. P. 19.1(e)(3) (allowing victim impact statements, but statements may not contain "any opinion or recommendation about an appropriate sentence"). "Victim impact evidence should not be allowed, however, if it is 'so unduly prejudicial that it renders the trial fundamentally unfair.'" *State v. Dann* ("*Dann III*"), 220 Ariz. 351, 369 ¶ 98 (2009) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)).

**¶149**      Strong did not object to the victim impact evidence until after it was presented, when he moved for a mistrial. "The trial court's decision whether to grant a mistrial is reviewed for an abuse of discretion, as is the admission of victim impact evidence." *State v. Gallardo*, 225 Ariz. 560, 567 ¶ 26 (2010) (internal citations omitted).

**¶150**      The victim impact statements characterizing the murders as "a satanic act" and stating that Strong "deserve[d] what's coming to [him], if not worse" were not so unduly prejudicial as to render the trial fundamentally unfair. The statements, although emotional, were no more improper than other statements this Court has found to be permissible. *See, e.g.*, *Burns*, 237 Ariz. at 30 ¶ 141 ("[A] family member's brief remarks about the impact of remembering or visualizing a victim's final moments were not unduly prejudicial."); *State v. Rose*, 231 Ariz. 500, 513 ¶ 57 (2013) (labeling a defendant as a "cop killer" was permissible); *State v. Cota*, 229 Ariz. 136, 150 ¶¶ 69–71 (2012) (finding a statement describing the victims' bodies as "mutilated" and "tortured" permissible); *State v. Bush*, 244 Ariz. 575, 593–94 ¶¶ 78, 82 (2018) (finding a victim's statements that her "daughter was shot at close range, like she was worth nothing" and "[c]lose enough to almost blow her face completely off" and that the victim was confused about "how someone could have that much hate in their heart" were permissible (alteration in original)).

**¶151**      Additionally, the statement that Strong "deserve[d] what's coming to [him], if not worse" did not violate the rule against offering an opinion or recommendation about an appropriate sentence. Although pressing for an "appropriate" or "just" sentence "come[s] dangerously close" to infringing the rule against recommending an appropriate sentence, this Court has found no violation of the rule in absence of an "express request" that the defendant be put to death. *See Rose*, 231 Ariz. at 513 ¶¶ 57–58 (finding no violation of the rule where victim requested the jury to "give the appropriate sentence"). The victim here did not make such an express statement. Additionally, during the statement the victim said Strong was already "in prison paying for [his] idiocy right where [he]

should be," lessening an implication that the victim was asking for Strong to be put to death.

¶152        Moreover, any prejudice caused by the statements was cured by the trial court's instructions. *See Dann III*, 220 Ariz. at 369–70 ¶ 101. Before and after the victims' statements, the court appropriately instructed the jurors that they could consider victim impact statements to the extent they rebutted mitigation evidence but that they could not consider the information as a new aggravating circumstance. It also instructed the jury that the victims were "not allowed to offer any opinion or recommendation regarding an appropriate sentence." The court did not abuse its discretion by admitting the victim impact statements or denying Strong's motion for a mistrial.

### 3. Multiple Homicide Statutory Aggravator

¶153        Strong argues the statutory aggravating factor of committing multiple homicides was not properly established. *See* § 13-751(F)(8). He asserts that although the victims died in the same home over the course of an afternoon and evening, the State did not prove that the multiple homicides were motivationally related. We review the jury's finding for an abuse of discretion and will uphold it if substantial evidence supporting the aggravator exists. *State v. Gunches* ("*Gunches I*"), 225 Ariz. 22, 25 ¶¶ 13–14 (2010). We view the evidence in the light most favorable to upholding the jury's findings. *Id.* ¶ 14.

¶154        Strong is correct that the (F)(8) aggravating factor requires jurors to find a "temporal, spatial, and motivational relationship between the homicides" and that the trial court did not instruct the jury as to that relationship. *See Payne*, 233 Ariz. at 515 ¶ 137. However, because Strong neither requested the correct instruction nor objected to the instruction given at trial, we review for fundamental error only. *See id.* at 516 ¶ 137. A defendant only shows fundamental error if no rational jury would "find a temporal, spatial, and motivational relationship between the murders." *See id.* ¶ 141.

¶155        Strong does not dispute that the murders were temporally and spatially related but argues that the State failed to prove the motivational relationship. This argument, however, fails.

¶156        Here, the State introduced evidence supporting the conclusion that the murders were motivationally related. The State presented evidence that Strong killed Luis because he refused to loan

Strong more money and then killed Adrienne, I.N., D.H., A.C., and E.B. because they could identify Strong as the killer. *See State v. (William C.) Miller*, 234 Ariz. 31, 45 ¶ 53 (2013) ("We have repeatedly found the motivational relationship requirement satisfied when evidence suggested that a defendant killed others in the vicinity to eliminate witnesses."). Although the (F)(8) instruction given was inadequate, Strong failed to show fundamental error because any rational jury would have found a motivational relationship between the murders of Luis, Adrienne, I.N., D.H., A.C., and E.B.

### 4. Abuse of Discretion Review

**¶157**      Strong urges this Court to independently review the aggravating and mitigating circumstances found by the jury. Because the murders in this case occurred after August 1, 2002, we do not independently review the aggravating and mitigating circumstances and the propriety of the death sentence. *State v. Morris*, 215 Ariz. 324, 340 ¶ 72 (2007). Rather, we review the jury's findings of aggravating circumstances and the imposition of the death penalty for an abuse of discretion. A.R.S. § 13-756(A).

**¶158**      We will not find "an abuse of discretion if 'there is any reasonable evidence in the record to sustain [the findings and sentences].'" *State v. Delahanty*, 226 Ariz. 503, 508 ¶ 36 (2011) (quoting *Morris*, 215 Ariz. at 341 ¶ 77). In conducting this review, we "view[] the facts in the light most favorable to sustaining the verdict." *State v. Gunches* ("*Gunches II*"), 240 Ariz. 198, 207 ¶ 41 (2016).

**¶159**      As previously stated, the jury found that the State proved the following three aggravating circumstances beyond a reasonable doubt: (1) Strong had been convicted of another offense for which a life sentence could be imposed under § 13-751(F)(1); (2) Strong had been convicted of committing one or more other homicides during the commission of the offense under (F)(8); and (3) with respect to the child victims, Strong was an adult and the victims were under fifteen years of age under (F)(9).

**¶160**      Reasonable evidence supports the jury's findings. As to the (F)(1) factor, the State presented evidence that Strong was convicted for the Gill Murder, and a certified copy of the conviction was admitted at trial. Regarding the (F)(8) factor, the State presented sufficient evidence that Strong murdered all six family members over the course of several hours and that there was a temporal, spatial, and motivational relationship between the homicides. *See Payne*, 233 Ariz. at 516 ¶ 137; Part (I)(3). And

as to the (F)(9) factor, Danny Heredia established the children's ages during his testimony.

¶161        Further, considering the evidence presented during the mitigation phase, the jury did not abuse its discretion when it imposed the death sentences in this case. Through his proffered mitigation evidence, Strong asserted that he was interested in helping others—especially those with disabilities—as shown by his employment history; was able to be employed; helped young adults and older children; had never been involved with drugs; and behaved well since being incarcerated. However, the State rebutted much of this mitigation evidence. It established that Strong had been convicted of a felony theft while living in Yuma; that he had ten felony convictions before arriving in Yuma; and that he had been convicted in connection with "put[ting] an 88-year-old lady in the hospital to steal her purse." The State also presented additional evidence arguing that leniency should not be shown. This evidence included details of the Gill Murder, including that Gill had died of asphyxiation by ligature, suffered blunt force trauma on various parts of his body, and was under Strong's control for approximately two hours before being killed. It was also established that Strong stole $24,000 from Gill in connection with that homicide.

¶162        The jury did not find the proffered mitigation sufficiently substantial to call for leniency, and, after considering this evidence, we conclude it did not abuse its discretion in doing so. *See State v. Hampton*, 213 Ariz. 167, 184 ¶ 81 (2006) (noting the aggravating factor of committing multiple murders during the commission of the offense is "extraordinarily weighty").

¶163        Strong also argues that the imposition of the death penalty violates the Eighth Amendment of the United States Constitution and article 2, section 24 of the Arizona Constitution because Arizona's capital sentencing structure fails to adequately narrow the class of defendants eligible for the death penalty. We rejected this argument in *State v. Hidalgo*, 241 Ariz. 543, 548 ¶ 7, 549–52 ¶¶ 14–29 (2017). For the reasons explained there, we reject this argument here.

**CONCLUSION**

¶164        We affirm Strong's convictions and death sentences.